# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TAMMY E. POL** | **CIVIL ACTION** |
| **VERSUS** | **NO:  06-1655-MVL-SS** |
| **MICHAEL J. ASTRUE,**<br>**COMMISSIONER SOCIAL**<br>**SECURITY ADMINISTRATION** | |

## REPORT AND RECOMMENDATION

The plaintiff, Tammy E. Pol ("Pol"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claims for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, and for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).  Rec. doc. 1.

## PROCEDURAL HISTORY

On January 24, 2002, Pol submitted an application for benefits.  R. 442-44.  She reported: (a) suffering from sarcoidosis in the lung, tumors in the throat and constant pain; (b) difficulty talking, shortness of breath and headaches; and (c) a disability that began on December 31, 1998. R. 58 and 442.  On January 30, 2003, her application was denied.  R. 445-46.  On April 15, 2004, a hearing before an ALJ was held.  R. 35.  On September 22, 2004, the ALJ issued an unfavorable decision.  R. 10-19.  On January 24, 2006, the Appeals Council denied her request for review.  R. 4-6.

On March 30, 2006, Pol filed a complaint for review with this Court.  Rec. doc. 1.  At the

request of the Commissioner and without opposition from Pol, the case was remanded to complete

the administrative record and include evidence that was omitted from Sections A, B and D of the

modular disability file and to identify certain exhibits that were admitted.  Rec. docs. 6 and 7.  The

parties submitted cross-motions for summary judgment.  Rec. doc. 14 and 16.  Pol was represented

by counsel throughout these proceedings.

## STATEMENT OF ISSUES ON APPEAL

Pol's filings raise the following issues:

1.    Whether the ALJ erred in relying on a residual functional capacity assessment which
      did not include any limitations for the severe impairment of migraine headaches?

2.    Whether the ALJ erred in failing to find that her vocal impairment was a severe
      impairment?

3.    Whether the ALJ erred in questioning her credibility?

## THE ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1.    The claimant meets the non-disability requirements for a period of disability and
      Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act
      and its insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset
      of disability.

3.    The claimant's chronic obstructive pulmonary disease, headaches and degenerative
      changes in the lumbar spine are considered "severe" based on the requirements in the
      Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4.    These medically determinable impairments do not meet or medically equal one of the
      listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding her limitations are not
      totally consistent with the medical evidence for the reasons set forth in the body of

the decision.

6.      The claimant has the residual functional capacity for work that involves sit/stand option and lifting up to 10 pounds.

7.      The claimant's past relevant work as telemarketer and telephone sales manager did not require the performance of work-related activities precluded by residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8.      The claimant's medically determinable chronic obstructive pulmonary disease, headaches and lumbar radiculopathy do not prevent the claimant from performing her past relevant work.

9.      The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.020(f)).

R. 18-19.

## ANALYSIS

a.      **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Newton, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues de novo or substitute its judgment for the Commissioner's. Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

3

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a

4

terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history."  Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Id.

b.      **Testimony at the Hearing.**

At the hearing, Pol was forty-five years old.  R. 38.  She grew up in Van Cleave, Mississippi. R. 38.  After her mother died in October 2003, she moved to her half-sister's home in Kenner, Louisiana.  R. 38 and 44.  She completed the ninth grate.  R. 38-39.  She did not do any household

---

severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

chores.  R. 44.  She only went shopping if someone went with her.  R. 44.

Her last employment was as a casino cashier in 2000.  R. 39.  Her earnings record was sparse.  She missed a lot of work over the years because of health problems.  R. 45.  She worked one year for a telemarketing company and made $25,000.  R. 46.  She was promoted to manager for the telemarketer.  R. 47.

The first health problem that interfered with Pol's ability to work was her difficulty in breathing.  R. 40.  This began about three to five years before the hearing and became worse over time.  R. 40.  She stopped working as a casino cashier because she hurt her rotator cuff.  R. 39.  She could not lift and carry a gallon of milk because of the problem with her shoulder.  R. 43.  For about a year prior to the hearing she had difficulty speaking.  She described a large swelling in her right neck and a thick lump in her left node that was extremely painful.  R. 39.

She suffered from shortness of breath which hindered her walking.  R. 42.  She experienced shortness of breath walking around the house.  R. 42-43.  She complained of low back problems. R. 41.  If she was required to sit for long periods of time, she had numbness in her buttocks that extended down her right leg.  R. 41.  She suffered from headaches about three or four times a week, which produced severe nausea, vomiting, poor vision and throbbing.  R. 41.  She took medication for her headaches and was required to lie down in a dark quiet room with a wet cloth on her head. R. 41.  Each headache episode lasted at least a day.  R. 42.  Medication did not resolve the headaches.  R. 42.  She experienced pain in her jaw at least twice a week.  She was forced to grab her jaw to relieve the problem.  She described it as TMJ.  R. 43.  She had a bleeding ulcer that caused her stomach to burn.  She had undergone multiple surgeries on her breast.  R. 44.  The pain from the surgeries made it difficult for her to lift and carry objects.  R. 45.

Pol smoked.  She was trying to quit.  R. 40.  She was allergic to the patches.  R. 46.

Cynthia Rickey, Pol's half-sister, reported that Pol lived with her since her mother died about six months before the hearing.  R. 48.  Pol had very bad headaches about two or three times a week. R. 48.  Pol experienced nausea and vomiting with the headaches and was forced to lie down in a dark room and be very quiet.  R. 48-49.  Pol experienced shortness of breath.  R. 49.  Rickey did all of the housework.  R. 49.  Pol had back and shoulder trouble.  Her right shoulder was very swollen. R. 49.  Rickey reported that Pol had difficulty sleeping, r. 49, and was tired during the day.  R. 50.

The vocational expert testified that Pol's work activities fell into sedentary semi-skilled classification. R. 50-51.  The ALJ asked the vocational expert to assume the following limitations: she could sit or stand throughout the day; and she could lift no more than ten pounds.  R. 51-52.  The vocational expert testified that, under these circumstances, she could return to her prior employment. R.  52.  However, if she had difficulty verbalizing at unpredictable times, she could not work as a telemarketer.  R. 52.  With difficultly verbalizing, there was no employment would require her to deal with people that Pol could perform on a continuous sustained basis.  R. 52-53.  She could perform some bench-type assembly tasks of a sedentary unskilled nature.  R. 52-53.  If she experienced migraine headaches that required her to lie down for an entire day, there would be no work she could perform.  R. 53-54.

c.      **Medical Records.**

On January 7, 1986, Pol was admitted for one week to the Ocean Springs Hospital ("Ocean Springs") for care of continued coughing of about two months duration.  Testing, including a bronchoscopy, was conducted.  She was diagnosed with mucopurulent bronchitis.  R. 92.

On December 2, 1995, Pol was seen at Kenner Regional Medical Center ("Kenner

Regional") and diagnosed with early pneumonia.  R. 128.  On December 16, 1995, she returned to Kenner Regional and was diagnosed with migraine headaches.  R. 127.

On March 2, 1996, Pol was admitted for one night to Kenner Regional for complaints of abdominal pain and migraine headaches.  She was scheduled for a follow-up visit and medication was prescribed.  Her condition at discharge was improved.  R. 99 and 126.  X-rays of the abdomen were normal.  R. 111.  The chest x-rays did not reveal any active lung disease.  R. 110.  Only minimal dextroconvexity of the lumbar spine was noted.  R. 109.  On March 5, 1996, she returned to Kenner Regional with complaints of nausea and vomiting.  R. 120.

On March 6, 1996, Pol was seen at the emergency room at Tulane University Hospital ("Tulane") for complaints of nausea, vomiting and abdominal pain.  She was given medication and told to schedule an appointment with a specialist.  R. 145-47.  On March 27, 1996, she returned to Tulane with a headache.  The diagnosis was recurrent migraine headaches.  She was given a prescription.  R. 143-44  On April 4, 1996, she was seen at Tulane's emergency room for a migraine headache.  The report includes the following:

> She has missed her neurology clinic appointment from yesterday.  She has also missed her medicine clinic and her GI clinic appointment.  This patient told the triage nurse initially that she had been unable to keep them down due to the frequent nausea.  Then, she tells me when she is ready to be discharged that she needs a prescription for some pain medication because she is out, and she has not had any for quite some time.  I am concerned about this patient's frequent drug use and I am also concerned by the fact that she appears to be unsedated with 75 mg of Demoral and 2 mg of Stadol  and only appears to be in distress when anyone walks into the room.

R. 140-41.


On April 29, 1996, she returned to Kenner Regional with complaints of nausea and vomiting.  The diagnosis was migraine headaches and chronic abdominal pain.  R. 118.  On May 15, 1996, she

was seen at Tulane for migraine headaches with nausea and vomiting.  She was given an injection of Demerol.  She was instructed to see a physician in the neurology department.  R. 138-39.[2]

On August 10, 1996, Pol was seen at Kenner Regional with pain in the back, left hip and left knee.  R. 112.  X-rays of the lumbar spine revealed dextroconvexity.  The disc spaces were fairly well preserved.  R. 117.  X rays of the pelvis, left hip and left knee were unremarkable.  R. 114-16.

On September 24, 1996, Pol was seen by Dr. Thompson M. Dietz on a referral from a dentist, Dr. Larry McMillen.  An MRI of the temporomandibular joints indicated:  (a) moderately advanced osteoarthritis of the left temporomandibular joint; (2) mild osteoarthritic changes on the right; (3) symmetrical limited range of condylar mobility; and (4) possible mastoiditis with the left mastoid air cells.  R. 136-37.

There are no records from then until April 29, 1997 when Pol was seen by Dr. Denny Taylor on a referral from Dr. Robert Wood.  An MRI of the lumbar spine indicated moderate degeneration at the L5-S1 disc space and a posterior central protrusion of 2-3 mm. at that space.  The remaining lumbar discs were normal.  R. 135.

On June 12, 1997, Pol was seen by Dr. John E. Jackson, a specialist in neurological surgery on a referral from Dr. Robert Wood.  Pol reported that prior to an August 10, 1996, auto accident, she was in good health.  She went to Kenner Regional's emergency room where she was given crutches, a splint and medication.  Physical therapy was not beneficial.  R. 133.  A June 20, 2007 MRI of the cervical spine revealed only mild deformities and the cervical cord was normally configured.  R. 131.  Dr. Jackson recommended conservative treatment.  R. 130 and 133-34.  A July

---

[2] The decision of the ALJ states that, "[r]ecords from Tulane University Hospital dated May 15, 1996, indicate the claimant was hospitalized for a migraine headache (Exhibit 5F, page 1).  The record, however, indicates that she was seen in the emergency room but was not hospitalized over night.  R. 138-39.

21, 1997, report by Dr. Jackson stated:

> Mrs. Pol is having an extraordinary large amount of pain when compared with the findings of the neurological exam which is objectively normal except for some tightness of the supraspinatus muscles as well as some very minor findings that are seen on the cervical MRI scan and lumbar MRI scan.

R.. 94 and 134.

There are no further medical records until August 24, 1998, when Dr. J. D. Olson performed an electrodiagnosis and found bilateral radiculopathies at C-5 and C-8. R. 148.

There are no medical records until February 20, 1999, when Pol was seen at Ocean Springs with complaints of a migraine headache with nausea and vomiting. She also reported congestion and a cough. She was given an injection. Medication was prescribed. R. 361-63. A February 26, 1999, chest x-ray was normal. R. 359.

On August 13, 1999, Pol returned to Ocean Springs with a complaint of a headache for three days and a couple of episodes of vomiting. She had received an injection from a private doctor for the migraine headache, but the pain returned. The report states, "[i]n the past, the patient has come to the emergency room and received injections of various narcotic medications." R 356. The diagnosis was migraine headache. Bed rest for twenty-four hours was prescribed. R. 357. On August 15, 1999, Pol returned to Ocean Springs with complaints of headache and backache. She was given injections and medication was prescribed. R. 352-53.

On October 25, 1999, Pol was seen at Ocean Springs with complaints of migraine headaches that began two to three days earlier. She was given medication and instructed to rest. R. 348-49.

On November 3, 1999, Pol was seen by Dr. Keith Kim on a referral from Dr. Scott Russell. Her complaint was tender right breast mass. It was described as a non-suspicious mass. A mammogram was recommended. R. 162-63. There was a 4 mm. cyst. No other abnormalities were

detected.  R. 161.  On January 3, 2000, Dr. Kim's diagnosis was benign mammogram.  R. 160.

On December 12, 1999, Pol was seen at Ocean Springs with complaints of a headache with nausea and a toothache.  She was given medication and instructed to see a dentist.  R. 345.  On January 3, 2000, she returned with a complaint of back pain following a fall.  She also reported a headache.  She was given an injection.  Medication was prescribed.  R. 302-04.

On February 4, 2000, she complained of tenderness in her groin.  The cyst in her right breast felt smaller and was much more difficult to locate.  There was evidence of a left inguinal hernia.  R. 158-59.  On February 10, 2000, there were a femoral hernia repair and an excision of a left inguinal lymph node.  R. 151-52, 245 and 249-50.  A February 10, 2000 pathology report for a left inguinal node did not reveal a sarcoid or tumor.  R. 152.

On March 25, 2000, Pol was seen at Ocean Springs with a complaint of head congestion.  She was diagnosed with an upper respiratory infection and mild bronchitis.  An injection was given.  Medication was prescribed.  She was told to quit smoking.  R. 332-333.

On May 12, 2000, Pol was seen at the Coastal Family Health Center ("Coastal Health") with complaints of headaches, pain in her jaw and ears, insomnia and depression.  R. 214.

On July 5, 2000, Pol was seen by Dr. Louis Rubenstein with complaints of pain.  R. 183.  Florciet was prescribed.  R. 183.  She returned on July 12, 2000 and reported no improvement.  R. 182.  On August 1, 2000, she reported headaches.  R. 181.  On August 5, 2000, she returned to Ocean Springs with a complaint of migraine headaches with nausea that began the day before.  She was given an injection.  R. 325-27.

On August 28, 2000, Pol reported left shoulder pain and swelling.  R. 180.  Dr. Rubenstein referred her to Dr. Winters, an orthopedist.  R. 179.  She complained of headaches, swollen glands,

sore throat, numbness in her left arm and hand.  She requested an excuse from work.  R. 179.  On

August 30, 2000, an x-ray of the cervical spine, which revealed some scoliosis but no evidence of

disc disease.  R. 246-48.  On September 12, 2000, Pol was seen by Dr. Robert E. Terrell, an

orthopedist in practice with Dr. Winters.  She was diagnosed with left shoulder and rotator cuff

dysfunction.  R. 172.  She was given a corticosteriod injection.  R. 172.

On September 19, 2000, Pol was seen at Ocean Springs with a complaint of pain in her left

shoulder.  She was diagnosed with acute left shoulder and neck pain.  Her arm was placed in a sling

and she was given an injection.  R. 322-23.  On September 23, 2000, she returned to Ocean Springs

with a complaint of pain in her left shoulder.  The report states:

> She has been to the emergency department numerous times for different pain
> medications, and it just seems to me that if she is being followed by two particular
> doctors that they would have given her the appropriate medication to handle her pain
> and her not to present on a Saturday afternoon to the emergency department for pain
> control.

R. 318-19.  She was diagnosed with chronic left shoulder pain and medication was prescribed.  R.

317-19.  On September 29, 2000, she described the pain as worse.  She had lost range of motion in

the shoulder.  R. 171.

On October 4, 2000, Pol was seen by Dr. Terrell, who thought there were significant

degenerative changes within the rotator cuff.  R. 170.  On October 16, 2000, she was seen by Dr.

Winters, who diagnosed her with neck and shoulder pain of an uncertain source.  X-rays and an MRI

of her shoulder revealed mild joint changes.  There were no marked abnormalities.  R. 169.  A

November 7, 2000 MRI of the cervical spine revealed very mild changes in the cervical disc spaces,

no cord or nerve root impingement, and no evidence of any cervical stenosis.  R. 164.  On November

29, 2000, Dr. Winters reported that she should be able to return to her regular job.  R. 168.

On November 6, 2000, Pol reported to Dr. Rubenstein that she had lost her voice.  She also reported sore throat, ear pain, headaches and neck and shoulder pain.  R. 176.  On November 20, 2000, she was seen at Ocean Springs with a complaint of a migraine headache.  She was given an injection.  R. 312-13.  On December 12, 2000, she returned with a complaint of migraine headaches for the past day with some nausea and vomiting.  She was given an injection.  R. 307-09.

On December 19, 2000, Dr. Terrell prescribed medication and referred her to therapy.  R. 168.  On January 23, 2001, Dr. Terrell reported she was close to maximum medical improvement ("MMI").  He reported that if her pain persisted, surgery was not indicated.  R. 167.  On February 20, 2001, Dr. Terrell reported she was at MMI.  He released her with no permanent work restrictions and no permanent partial impairment.  R. 167.

On January 30, 2001, Pol was seen at Ocean Springs with a complaint of a severe headache with nausea and vomiting.  She was given an injection.  R. 296-98.[3]  On February 22, 2001, she was seen at Coastal Health with complaints of headaches, pain in her left ear and sore throat.  R. 213.  On March 9, 2001, she was seen at Ocean Springs with complaints of aches and pains for the two previous days.  She was given injections.  Medication was prescribed.  R. 291-93.  On March 19, 2001, she returned to Coastal Health with complaints of migraine headaches and pain in her left ear.  R. 212.

On April 1, 2001, she was seen at Ocean Springs for low back pain following a fall.  Medication was prescribed.  R. 285-86.  On April 20, 2001, Pol was seen at Coastal Health with complaints of headaches for four days, coughing and a sore throat. R. 211.  On May 8, 2001, she was

_____

[3] The decision of the ALJ describes Pol as "hospitalized" on this date.  The record indicates that she was seen at the emergency room for Oceans Springs Hospital on this date but that she was not admitted to the hospital for the night.  R. 296-98.

13

seen for complaints of right ear pain. R. 210.  On May 31, 2001, she returned with complaints of headaches. R. 209.  On July 21, 2001, Poll returned to Ocean Springs with a complaint of headache, nausea and vomiting.  She was given an injection.  R. 277-78.

On September 4, 2001, Pol was seen at Coastal Health with complaints of congestion and coughing. R. 208.  On September 20, 2001, she returned with complaints of congestion, sinus drainage, coughing and headaches. R. 207.  On October 4, 2001, she reported complaints of rash on her neck and migraine headache for two days. She was diagnosed with depression.  R. 206.  On October 15, 2001, she was seen at Ocean Springs with a complaint of a headache and she was given an injection.  R. 273-74.  On October 22, 2001, she was seen at Coastal Health with complaints of headaches.

On January 2, 2002, Pol was seen at Ocean Springs because of a headache and she was given an injection.  R. 269-70.  On January 3, 2002, she returned with a complaint of headache.  Although she was seen the day before, she did not feel any better.  She was given another injection.  R. 265-66.  On January 9, 2002, she was seen at Coastal Health reporting that she had been to the emergency room twice during the month.  R. 204.  On January 18, 2002, she was seen by Dr. Rubenstein and reported neck and shoulder pain, swollen node, right ear pain, headaches, chills and fever, head congestion and nausea.  R. 174.  On January 22, 2002, she saw Dr. Ray Weiss at the request of Dr. Rubenstein for throat and neck complaints.  He diagnosed right TMJ irritation and a history of migraines.  R. 365.  On January 26, 2002, she returned to Coastal Health with complaints of earache, sore throat and headache.  R. 203.

On February 6, 2002, Pol was seen by Dr. Rubenstein.  She reported sore throat, asthma and severe headache.  R. 174.  On February 9, 2002, she was seen at Coastal Health with complaints of

14

fever, asthma and pain in her right breast.  The diagnosis included tobacco addiction.  R. 202.  On

February 18, 2002, she was seen by Dr. Rubenstein reporting headaches, congestion in her head and

chest, coughing, tightness in her chest, pain in the right side of her neck into her head and loss of

her voice.  R. 173.  On February 25, 2002, she was seen at Coastal Health with complaints of

continued pain in her right breast, headaches and pain in her right ear.  R. 201.

The findings on a March 6, 2002 mammogram were benign.  R. 243.  A biopsy was

recommended for the results of a sonogram.  R. 244.  On March 20, 2002, Pol was seen at Ocean

Springs, with a complaint of a migraine headache and she was given an injection.  R. 340.  On

March 26, 2002, she returned to Coastal Health with complaints of cough, congestion, fever and

headaches.  R. 200.

On April 11, 2002, Pol was seen at Ocean Springs for complaint of migraine headache with

nausea and vomiting and she was given an injection.  R. 336-37.[4]  On April 16, 2002, she was seen

at Coastal Health with complaints that the headaches were no better and the other conditions,

including swollen glands, hoarseness and sore throat, had become worse.  R. 199.  On June 3, 2002,

her prescriptions were renewed at Coastal Health.  R. 371.

On June 12, 2002, Pol was seen at Singing River Hospital ("Singing River") in Pascagoula,

Mississippi with complaints of migraine headache and she was given an injection.  R. 257-58.  On

June 14, 2002, Pol was to have a breast biopsy at Singing River.  She became upset with the needles

and did not have the procedure.  R. 259.  On July 23, 2002, a lesion in the breast was excised.  R.

237-38 and 240-41.  There was no evidence of malignancy.  R. 239.

On June 7, 2002, Dr. Maples, a medical consultant, determined that the following were not

---

[4] The ALJ's decision describes Pol as "hospitalized" on this date.  R. 15.  The record indicates that she was seen at the emergency room and was not admitted to the hospital for the night.  R. 336-37.

severe:  migraine headache condition; the problem in the throat; and pain in the neck and shoulder. The medical consultant's response noted that the neurological examination was normal.  There was no evidence of sarcoid.  R. 215.

On June 26, 2002, there were a pulmonary function disability report and a disability calibration report.  R. 216-19.  On July 22, 2002, Dr. S. H. McDonnieal completed a medical consultant staff response with suggestions on Pol's complaints.  R. 220.

On August 6, 2002, a psychologist completed a psychiatric review technique form and found that Pol's impairment, affective disorders, was not severe.  R. 221-34.

On August 12, 2002, the results of a chest x-ray were unchanged from 1999.  Only mild scarring was found in the right upper lobe of the lung and both lung bases. R. 236.

On August 15, 2002, a medical consultant, Dr. Kossman, reported that Pol's sarcoid condition was not severe.  R. 251.

On September 5, 2002, Pol was seen at Coastal Family with complaints of congestion, ear pain, sore throat, coughing and headaches.  Medication was prescribed.  R. 370.  On September 6, 2002, x-rays of the right elbow demonstrated amputation of the radial head.  The remainder of the exam was normal.  The x-ray of the left knee revealed no osseous or soft tissue abnormalities.  R. 235.  On September 24, 2002, she was seen at Coastal Health by Dr. Keith Kersten with complaints of congestion, drainage in her throat, throat irritation and vomiting.  Medication was prescribed.  R. 367 and 369.  On September 25, 2002, she was seen at Singing River's emergency room for complaints of pain in her left hip and arm from a fall.  She also reported migraine headaches. Medication was prescribed.  R. 252-53.

On October 9, 2002, Pol was seen by Dr. Kersten for complaints of a cough, cold, sore throat

16

and headache.  Medication was prescribed.  R. 368.  On October 24, 2002, she returned to Dr. Kersten for complaints of a swollen neck on the right side and swollen right breast.  R. 366.

On November 27, 2002, Pol was seen by Dr. Rubenstein with complaints of cough, chills, ear pain, sore throat and chest pain.  R. 389.

On January 6, 2003, Pol was seen at Coastal Health by Dr. Kersten with complaints of a cough, cold, sinus headaches and pain in her ears.  Medication was prescribed.  R. 419-20.  On January 13, 2003, she was seen by Dr. Rubenstein with complaints of left side facial pain, ear pain, swollen glands, headaches, sore throat and fever.  R. 389.  On January 14, 2003, she was seen at Ocean Springs emergency room for headache pain.  The emergency room physician, Dr. Edward O'Brien, reported that her condition improved with the injections provided in the emergency room. Because of this improvement she was discharged and instructed to resume her prescribed medications.  R. 437-39.

On February 5, 2003, Pol was seen by Dr. Kersten for refills of her medication.  R. 417-418. On February 24, 2003, she was seen by Dr. Rubenstein with complaints of headaches, ear pain and wheezing.  R. 388.

On March 18, 2003, Pol was seen by Dr. Rubenstein with complaints of right ear pain and sore throat.  R. 387.  On March 21, 2003, she was seen at Coastal Health by Dr. Kersten for complaints for ear pain and back pain.  Medication was prescribed.  She was referred for a pulmonary exam in Biloxi.  R. 415-16

On April 16, 2003, Pol was seen at Coastal Health for complaints of congestion, fever, coughing, tightness in the chest and headaches.  R. 413.  On April 28, 2003, she was seen by Dr. Kersten for a cough and congestion.  Medication was prescribed.  R. 412.

On May 7, 2003, Pol was seen by Dr. Kersten for complaints of headaches and left ear pain. Medication was prescribed. R. 411. On May 12, 2003, she was seen at Coastal Health for a surgical consult and a pap exam. R. 405-10. On May 28, 2003, she was seen at Coastal Health by Dr. Kersten with complaints of headaches. Medication was prescribed. A breast biopsy was recommended. R. 403-04.

On June 16, 2003, Pol was seen at Coastal Health by Dr. Kersten with complaints of headaches and pain in the right ear. Medication was prescribed. R. 401 and 402. On June 22, 2003, she was seen at Ocean Springs emergency room for headache pain. She was given an injection. R. 433-35. On July 3, 2003, Pol was seen at Coastal Health by Dr. Kersten with complaints of headaches. Medication was prescribed. R. 399 and 400.

On August 6, 2003, Pol was seen by Dr. Ijlal Babar, a pulmonologist. She reported a history of severe childhood asthma which improved when she became a young adult. In the 1980s she began to have respiratory symptoms and was diagnosed with sarcoidosis. She reported the sarcoidosis had become worse. She reported that she was barely able to get around her house because of shortness of breath. She was required to use her inhaler at least one or twice a night and always in the early morning. She reported smoking for eight years. Her voice had become hoarse. Dr. Babar's examination revealed expiratory wheezes which were mild and bilateral. He recommended additional testing, including chest x-ray, pulmonary function test and an ENT consult to evaluate her vocal cords. R. 380-83. On August 20, 2003, she was seen by Dr. Charles Wilson on a referral from Dr. Babar to evaluate her hoarseness. He recommended that she be evaluated by a laryngologist. R. 364. September 12, 2003, chest x-rays indicated that the lungs were hyperexpanded, and scarring was found on the right upper lobe. The heart size was normal. R. 378

18

and 431.  On December 8, 2003, Dr. Babar issued a report indicating that lung volumes were within

the normal range.  R. 375.        On August 7, 2003, Pol was seen at Coastal Health by Dr. Kersten for

complaints of nasal congestion and asthma.  R. 397-98.  On September 9, 2003, Pol was seen at

Coastal Health for refills of her medication.  R. 394.

On October 11, 2003, Pol was seen at Ocean Springs emergency room with a headache.  The

diagnosis was acute headache secondary to grief reaction over the death of her mother.  She was

given injections.  R. 428-30.  On October 13, 2003, she returned with a headache.  Injections for

pain and nausea were given.  Medication was prescribed.  R.425-27.  On October 17, 2003, she

returned with a headache.  She was given injections for her pain.  Medication was prescribed.  R.

423-24.  On October 21, 2003, she was seen at Coastal Health with complaints of headache, sore

throat and right earache.  R. 391.  On October 30, 2003, it was noted that Pol was not doing well

following the death of her mother.  R. 390.

On January 6, 2004, at the request of Dr. Rubenstein, Pol had outpatient lab work.  The

diagnosis was acute bronchitis.  R. 384 and 421-22.  January 7, 2004, x-rays with comparisons from

August 2002 and August 2003 suggested chronic obstructive pulmonary disease.  R. 385.

d.      **Plaintiff's Appeal.**

Issue no. 1.       Whether the ALJ erred in relying on a residual functional capacity assessment which
                  did not include any limitations for the severe impairment of migraine headaches?

Pol contends that the record demonstrates that she had a long history of migraine headaches.

Although the ALJ noted that her headaches were a severe impairment, she argues that the ALJ failed

to include any limitation for the headaches.  She urges that the ALJ selectively focused on a single

entry for an emergency room visit on January 14, 2003 as demonstrating that her headache condition

had improved.  She contends that the ALJ's consideration of the evidence on the headaches amounts

to "picking and choosing" evidence, which is not permitted.  The Commissioner responds that:  (a) the ALJ fully considered the implications of Pol's headaches; (b) the ALJ properly discounted her allegations of disabling impairment due to migraine headaches; (c) the medical history indicates that she suffered from migraine headaches for many years before she claimed she was disabled; and (d) she received relief for her complaints from medication.

There is no basis for Pol's complaint that the ALJ's consideration of her treatment for migraine headaches amounts to "picking and choosing."  The ALJ recorded that Pol had a history of migraine headaches, r. 14, and the summary of the medical evidence refers to Pol's treatment for headaches at Tulane in 1996, Oceans Springs in 2001, 2002 and 2003, a second hospital in 2002, and treatment by an emergency room physician, Dr. O'Brien, on January 14, 2003.  R. 15-16.  The ALJ determined that her headaches were a severe impairment after referring to her testimony on the frequency of her headaches.  R. 16.

In posing the hypothetical question to the vocation expert, the AJL did not assign any limitation for migraine headaches.  R. 51-52.  Pol's counsel asked the expert to assume that she had two to four migraine headaches per week, which would require her to lie down in a dark room up to an entire day.  R. 53.  The expert responded that she would not be able to return to past relevant work.  R. 54.

On this first issue, the question is whether there was substantial evidence in the medical record to support the ALJ's exclusion of limitations for the migraine headaches.  Pol's challenge to the ALJ's finding on her credibility is addressed below in the discussion of the third issue.

The first report in the medical records of migraine headaches was in December 1995 at Kenner Regional.  R. 127.  Three months later, in March 1996, she returned to Kenner Regional with

migraine headaches.  R. 126.  Also, in March 1996, she was seen at Tulane for migraine headaches.

Tulane expressed concern over her frequent drug use and noted that she only appeared in distress

in when someone walked into the room.  R. 140-41.  She reported migraine headaches on one visit

to Kenner regional in April 1996 and on one visit to Tulane in May 1996.  R. 118 and 138-39.  For

the next year there are no reports of migraine headaches until her July 21, 1997 examination by Dr.

Jackson for complaints of pain in her neck and back following an auto accident.  She related to him

that she had a history of migraine headaches for eighteen years.  R. 133-34.  From July 1997 until

an August 13, 1999 visit to Ocean Springs, there are no reports of treatment for migraine headaches.

R. 356.  Pol returned to Ocean Springs on October 25 and December 12, 1999 with complaints of

migraine headaches.  R. 345, 348-49.

In 2000 and 2001, she complained of migraine headaches on at least fourteen occasions.[5]

From October 4, 2000 through February 21, 2001, she was seen by Drs. Winters and Terrell for

complaints of neck and shoulder pain.  Both physicians reported she could return to work with no

permanent work restrictions and no permanent impairment.  R. 167-68.  In 2002 and 2003, she was

seen at Oceans Springs and Singing River with complaints of migraine headaches.  On January 14,

2003, Dr. O'Brien, an ER physician at Ocean Springs, reported that her condition improved with

injections.  She was discharged and instructed to resume her prescribed medications.  R. 438-39.

The medical records indicate that this is what occurred on her visits to the emergency room in 2002

and 2003.

Disabling pain must be constant, unremitting, and wholly unresponsive to therapeutic

---

[5] The dates were:  May 12, July 5, August 1, August 5, August 28, November 20, and December 12, 2000; and January 30, March 9, April 20, May 31, July 21, and October 4, 15 and 22, 2001.  R. 180, 181, 183, 205-06, 209, 211, 214, 273-74, 277-78, 291-93, 296-98, 307-09, 312-13 and 325-327.

treatment.  <u>Falco v. Shalala</u>, 27 F.3d 160, 163 (5th Cir. 1994).  By her history, Pol had migraine headaches since 1979, but she did not become disabled until 1998.  Prior to 1998 she was able to work with the migraine headaches.  Between 1998 and the termination of the medical records in January 2004, there were significant periods of time when there were no reports of migraine headaches.  This demonstrates that the pain from the migraine headaches was neither constant nor unremitting.  When she sought treatment for migraine headaches, her condition improved.  None of the physicians that saw Pol placed any limits on her activity as a result of her headaches.  At least two of the physicians cleared her to return to work without limitation.  There is substantial evidence to support the ALJ's decision to exclude any limitations for migraine headaches in the assessment of her residual functional capacity.

<u>Issue no. 2</u>.      Whether the ALJ erred in failing to find that Pol's vocal impairment was a severe
                       impairment?

Pol raises two questions.  The first is whether the ALJ's decision was required to refer to <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985).  The second is whether the condition of her voice was a disabling impairment.

In <u>Stone</u>, the claim for disability benefits was dismissed at the second step in the five step analysis on a determination that the claimant's impairment was not severe.  The Fifth Circuit held that the ALJ applied the wrong legal standard in making the determination.

> An impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

752 F.2d at 1101(brackets and quotation marks omitted).  Pol refers to the following statement in <u>Stone</u>,

> In view of both the Secretary's position in this case and our recent experience with cases where the disposition has been on the basis of nonseverity, we will in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used.

752 F.2d at 1106.  The Fifth Circuit has not imposed an absolute requirement for citation to Stone, particularly where the analysis progressed beyond step two.  See Jones v. Bowen, 829 F.2d 524, 526 n. 1 (5th Cir. 1987) (rejecting argument that the ALJ applied incorrect standard under Stone v. Heckler where the ALJ concluded at the fourth and fifth steps that claimant could perform past relevant work and full range of light work activities); Chaparro v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987) ("this case did not turn on whether or not Chaparro's impairment was severe, but on whether Chaparro could return to his past relevant work-an inquiry unaffected by the test set forth in Stone."); and Shipley v. Secretary of HHS, 812 F.2d 934, 935 (5th Cir. 1987) (the ALJ's finding that he was able to perform the work of a security guard "suggests, without explicitly stating, a finding that claimant's disability was severe under the Stone test.").

Pol relies on Loza v. Apfel, 219 F.3d 378 (5th Cir. 2000), in which the Fifth Circuit concluded that, because the ALJ did not cite Stone or expressly state that the Fifth Circuit's construction of 20 C.F.R. § 404.1520(c) was used, it was assumed that the ALJ and the Appeals Council applied an incorrect standard to the severity requirement.  Loza did not criticize or overrule Jones v. Bowen, Chaparro v. Bowen, or Shipley v. Secretary of HHS.  Where the determination that a person is not disabled is made beyond the second step, neither Stone nor Loza require the ALJ to refer to Stone in regard to the severity requirement.

At the April 15, 2005 hearing, the ALJ noted that Pol had difficulties speaking.  R. 39.  She was not sure what caused it.  She reported having the problem for about a year.  R. 39-40.  The

vocational expert testified that if she had difficulty verbalizing at unpredictable times, she could not return to her prior work as a telemarketer.  R. 52.  The ALL found that she could return to her work as a telemarketer and telephone sales manager.  R. 18.

The first reference in the medical records to a loss of voice appears in November 2000, when Pol visited Dr. Rubenstein.  R. 176.  There are no further references to a loss of voice until August 6, 2003, when she was seen by Dr. Babar, a pulmonologist.  She reported that her voice became hoarse on occasion.  R. 381.  On August 20, 2003, Pol was seen by Dr. Wilson, an ENT specialist, for an evaluation of her hoarseness.  She reported that for the preceding year and a half she experienced intermittent loss of voice associated occasionally with a cough.  Dr. Wilson examined her larynx with a fiberoptic flexible largynogoscopy and found that her true vocal cord motion was intact bilaterally.  There was no evidence of mucosal lesions.  She had difficulty with plosives.[6]  R. 364.  The ALJ's decision that her voice problem did not prevent return to her prior work was supported by substantial evidence.

<u>Issue no. 3</u>.      Whether the ALJ erred in questioning Pol's credibility?

The ALJ found that Pol's allegations regarding her limitations were not totally consistent with the medical evidence.  R. 18.  The ALJ said:

> While the claimant has some limitations due to her impairments, the severe complaints alleged by the claimant are not fully consistent with the medical evidence.  She has not required chronic treatment for any of her physical conditions. As of January 2003 it was noted the claimant's headaches were improved.  She has never been to a pain clinic.  Further, she continued to smoke cigarettes that adversely effect her breathing.  No physician has disabled claimant.

R. 16.  Pol urges that the ALJ failed to follow Social Security Ruling 96-7p, 1996 WL 374186

---

[6] "Speech sound made by impouding the air stream for a moment and then suddenly releasing it."  Stedman's Medical Dictionary (26th Ed. 1995), p. 1389.  The Commissioner describes this as difficulty yelling or raising her voice. Rec. doc. 16 at p. 6.

(S.S.A.), in evaluating her credibility.  She contends that the ALJ was required to consider other facts, for example her daily activities, in addition to the medical evidence.  SSR 96-7p refers to 20 C.F.R. § 404.1529(c) in describing the requirement for a finding on credibility.  The regulation requires only that the ALJ evaluate the factors.  It does not state that the ALJ must discuss each factor.  In Wren v. Sullivan, 925 F.2d 123 (5th Cir. 1991), the Fifth Circuit affirmed the ALJ's determination that the extent of the claimant's subjective complaints of pain, weakness, limitation of motion and other subjective symptomatology were not borne out by the credible medical findings of record.  Id. at 128-29.

The medical records begin with a January 7, 1986 visit to a hospital in Oceans Springs for continued coughing and end eighteen years later with a January 6, 2004 diagnosis of acute bronchitis.  R. 92 and 385.  During that time she was seen by several physicians for extended periods.[7]  She was seen regularly at several hospitals.  She was referred to a number of specialists none of whom reported that she was disabled and unable to return work.  On November 7, 2000, Dr. Winters reported that she should be able to return to her regular work.  R. 168.  On February 20, 2001, Dr. Terrell released her with no permanent work restrictions and no permanent partial impairment.  R. 167.  She was not hospitalized for her complaints of migraine headaches.  She was given injections or other medication and released.  There is substantial record evidence to support the ALJ's finding that her Pol's allegations regarding her limitations were not totally consistent with the medical evidence.

## RECOMMENDATION

---

[7]  Pol was seen by:  (1) Dr. Rubenstein from July 5, 2000 through January 6, 2004 (R. 183 and 384); (2) Drs. Winters and Terrell from August 28, 2000 to February 20, 2001 (R. 167 and 180); and (3) Dr. Kersten from September 24, 2002 through August 7, 2003 (R. 367 and 397).

Accordingly, IT IS RECOMMENDED that the Commissioner's cross-motion for summary judgment (Rec. docs. 16 and 17) be granted and that Pol's motion for summary judgment (Rec. doc. 14) be denied.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 11th day of June, 2007.

**SALLY SHUSHAN**
**United States Magistrate Judge**